# United States Court of Appeals for the Fifth Circuit

_____

No. 25-20195

_____

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2026

Lyle W. Cayce
Clerk

Jennifer Ramsey,

*Plaintiff—Appellant*,

*versus*

San Jacinto College District,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-1719

_____

Before Richman, Higginson, and Oldham, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:[*]

Jennifer Ramsey brought employment discrimination claims under the Americans with Disabilities Act (ADA)[1] and the Family and Medical Leave Act (FMLA)[2] against her employer San Jacinto College District (SJC).

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] 42 U.S.C. § 12101, *et seq*.

[2] 29 U.S.C. § 2601, *et seq*.

No. 25-20195

The district court granted SJC's motion for summary judgment. We reverse in part.

**I**

Jennifer Ramsey began working for SJC in 2005. She was promoted four times and received positive performance reviews for many years. In her last position as Manager of Learning Technology, she oversaw the implementation of learning technology and "module(s) in an integrated software platform."

Starting in 2018, Ramsey began to suffer from a "severe medical condition" that affected her "vision, hearing, balance, and other cognitive functions." She obtained FMLA leave from November 2020 through January 4, 2021, for surgery related to her condition. Her physician cleared her to work without restrictions on January 4, 2021. Eleven days later, on January 15, 2021, Ramsey's immediate supervisor at the time, Gabriel Rodriguez, sent her a "Letter of Expectations" that stated Ramsey had arrived "well after [her] stated start time" twice that week "without communicating . . . in advance . . . that [she] would be late." Though Ramsey had been out on FMLA leave the few months prior, Rodriguez also stated, "This has happened many times over the past several months." Ramsey disputed the letter of expectations and claimed that it contained "untrue and misleading statements." This was the first time she had received a written complaint about her work. Rodriguez at some point also nominated Ramsey for the "COVID-19 Hero" award, which she received in 2021.

In March 2021, Ramsey was approved to change her work schedule to start an hour later, at 9 am, to assist her in arriving to work on time. Ramsey, still experiencing medical issues, applied for additional FMLA leave, and SJC informed her on May 28 that it had insufficient information to make a final

decision regarding approval and needed more information.  On June 3, 2021, Ramsey's immediate supervisor, now Ronald Sanchez, sent her a "Corrective Action Notice."  The notice recounted that Ramsey had sent an email saying that she was running late at 9:30 a.m. that morning, the time she was scheduled to have a meeting with her supervisor.  In that email exchange, Ramsey said she had been working on something else and that it was a "mismanagement of time on [her] part."  The notice also referred to an incident weeks earlier on May 12 when Ramsey did not come to the office in the morning, and when her supervisor checked in with her, Ramsey said that a dishwasher delivery had run late.  The notice additionally stated that Ramsey's leave report for May 2021 was not timely submitted and that payroll had sent an email about the missed deadline.  The notice also listed three other leave reports that had not been submitted on time the previous year: April 2020, August 2020, and October 2020.

In a performance review for the period April 2020 to April 2021, signed on July 6, 2021, Sanchez wrote that there were "times this year where accountability could be improved in timely completing tasks or work products."  However, he also wrote that Ramsey had "rated [herself] valuable and the HR validation committee agreed to the valuable rating."  Around this same time, there was a transition between supervisors, and Sanchez emailed Ramsey on July 1, 2021, outlining three additional instances of communication issues and tardiness and encouraging her to improve under her new supervisor.

Ramsey required an additional surgery and took FMLA leave a second time from July 27 to September 7, 2021.  Before her surgery, she sent several texts to her new supervisor Kam Marvel about her medical condition.  She was cleared to work without restrictions on September 7, 2021.  Her physician submitted forms for intermittent FMLA leave, and her leave time from June 28 to September 7 was approved for retroactive leave on

September 10.  Ongoing, intermittent leave was granted on September 18. On October 7, SJC revised the approval to add leave for migraine flareups.

After she had returned to work, Ramsey was asked to create certain training sessions by September 24, 2021, and she failed to complete the sessions by the due date.  The person who requested the sessions had to implement an alternative plan of action.  This particular incident was mentioned in the letter notifying Ramsey that her employment was terminated.  Ramsey, for her part, stated that on her return from her second FMLA leave, she "encountered significant issues" with the relevant system, "which was in a disorganized state and was not attributable to [her]."  She missed another deadline with a report her supervisor requested.  She explained: "As leadership continued to prioritize tasks in an ad-hoc manner, many of my other duties were postponed, causing me to miss expected deadlines.  When I raised concerns about the overwhelming and conflicting priorities, I was told by my direct leader that my job duties and workload were being evaluated."

After she had returned from FMLA leave from September to November 2021, she texted Marvel that she was coming in late for work ten times for various reasons.  Those reasons included traffic, forgetting something at home, running behind schedule, cleaning "rodent carnage" in her house, a tire leak, an unexpected visit from her daughter, and a medical event with her mother.  She also emailed Marvel on two occasions when a migraine impacted her ability to come to work.  On November 4, 2021, Marvel sent Ramsey a "Final Corrective Action Notice," which cited Ramsey's continued late arrivals to meetings and missed deadlines.  The notice also discussed instances where Ramsey was "unprofessional" and spoke in elevated tones. The notice described Ramsey's negative reaction to a conversation with her supervisor about these instances where she was quoted as saying, "Why do I have to accommodate everyone?  Nobody

accommodates me." Ramsey has explained that this description did not include the context that she was trying to clarify that her voice was raised because of her hearing issues.

Due to her migraines, Ramsey asked that the fluorescent lighting in her office be replaced with softer lights. After raising the issue to her supervisors and not receiving support, she bought lamps for her office. She attests that her supervisors told her about a complaint that she was "unapproachable" since her door was shut and her office was dark. Additionally, for her hearing issues, she requested a specialized headset; after not receiving responses from SJC, she purchased her own. Later, that headset was causing pain, so she talked with Marvel about getting a new device. Marvel acknowledged her request in an email on November 19, 2021, and cc'd an HR employee who emailed Ramsey back on November 29 with a form to fill out.

On November 21, 2021, Marvel and Ramsey had a meeting. During that meeting, Marvel's notes reflect Ramsey made the following comments: she had a brain injury and was written up three times; over eight months, there was no empathy; she talked with HR and believed she had a case with the EEOC and TWC; and she said "this is wrong."

On December 1, 2021, Marvel recommended that SJC terminate Ramsey's employment due to her performance deficiencies. SJC's Chancellor, Dr. Brenda Hellyer, approved the recommendation. Marvel issued a "Notice of Termination" to Ramsey on December 3, 2021. The notice pointed to missed deadlines and errors in Ramsey's work since the Final Corrective Action Notice was issued. Ramsey appealed the decision on December 10, discussing her medical conditions and treatment over the past year. She sent the appeal email to several people, and she bcc'd Dr. Hellyer.

No. 25-20195

About a month later, Dr. Hellyer affirmed the decision to terminate Ramsey's employment.

On September 29, 2022, Ramsey filed a complaint with the Equal Employment Opportunity Commission, which issued a right-to-sue letter in February 2023. Ramsey filed suit a few months later, alleging claims under the ADA and FMLA. The district court granted SJC's motion for summary judgment. Ramsey timely appealed.

## II

We review "a district court's grant of summary judgment de novo, applying the same standards as the district court."[3] "Summary judgment is proper where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[4] "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[5] "In reviewing a motion for summary judgment, factual inferences are viewed in the light most favorable to the nonmoving party."[6] "On summary judgment, courts may not 'evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes' because the 'sole question is whether a reasonable

---

[3] *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017) (quoting *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011)).

[4] *Id.* (quoting FED. R. CIV. P. 56(a)).

[5] *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013)).

[6] *Caldwell*, 850 F.3d at 241.

jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor.'"[7]

On appeal, Ramsey only contests the disposition of her ADA discrimination and retaliation claims and her FMLA retaliation and interference claims.

## A

"The ADA prohibits 'discriminat[ion] against a qualified individual on the basis of disability' by employers."[8] "When a plaintiff can offer only circumstantial evidence to prove a violation of the ADA, this court applies the *McDonnell Douglas* burden-shifting framework."[9] "Under this framework, the plaintiff must make a *prima facie* showing of discrimination."[10] "Once the showing is made, a presumption of discrimination arises, and the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action.'"[11] "The burden then shifts to the plaintiff to show the articulated reason is pretextual."[12]

On appeal, SJC does not challenge Ramsey's showing of a prima facie case and focuses its arguments on pretext. Pretext is the primary issue

---

[7] *Way v. City of Missouri City*, 133 F.4th 509, 516 (5th Cir. 2025) (quoting *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021)).

[8] *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 483 (5th Cir. 2023), *as revised* (Aug. 4, 2023) (quoting 42 U.S.C. § 12112(a)).

[9] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015) (quoting *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)).

[10] *Id.*

[11] *Id.* (quoting *Chevron Phillips*, 570 F.3d at 615).

[12] *Id.*

debated. However, since the district court found that Ramsey did not establish her prima facie case, we briefly address the elements of her claim.

"To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that [s]he has a disability; (2) that [s]he was qualified for the job; and (3) that [s]he was subject to an adverse employment decision on account of h[er] disability."[13] First, Ramsey's description of her "severe medical condition," which affected her "vision, hearing, balance, and other cognitive functions," is sufficient to raise a fact issue with regard to her disability.[14] Second, her positive performance reviews and her physician's indication that she could continue to perform the job with her disability raise a fact issue with regard to her qualifications for the job.[15] For the third element, the district court correctly noted that Ramsey's termination constituted an adverse employment action.[16] However, the district court did not proceed to analyze whether that action was due to her disability because it used a test for a prima facie case of discrimination that has a fourth element

---

[13] *Mueck*, 75 F.4th at 483 (quoting *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020)).

[14] *See* 42 U.S.C. § 12102(1)(A) (defining a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"); *see also Way v. City of Missouri City*, 133 F.4th 509, 517 n.8 (5th Cir. 2025) ("If the scope of 'disability' seems wide, it is intentionally so. Initially enacted in 1990, the ADA was amended in 2008 to 'make it easier for people with disabilities to obtain protection under the ADA,' principally by 'broadening the definition of disability.'" (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016))).

[15] *See Weber v. BNSF Ry. Co.*, 989 F.3d 320, 324 (5th Cir. 2021) (noting that a plaintiff is qualified for the job if she can "perform the essential functions of [her] job in spite of [her] disability").

[16] *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 700 (5th Cir. 2014) ("It is undisputed that [the plaintiff] suffered an adverse employment action-namely, termination.").

requiring that "she was replaced by a non-disabled person or was treated less favorably than non-disabled employees."[17]

As we recognized in *EEOC v. LHC Group, Inc.*,[18] there is a "discrepancy in the Fifth Circuit's cases evaluating the requisite nexus between an employee's disability and her termination."[19] For the reasons identified in that case, we apply the three-element test listed above.[20] As we stated, the fourth element is "best understood as providing one possible way to prove nexus between the employee's disability and her termination."[21] Ramsey raised a fact issue as to whether she was fired on account of her disability. She received written notifications of inadequate performance only after returning from FMLA leave with continuing medical issues. The Final Corrective Action Notice, when viewed in the light most favorable to Ramsey, described "unprofessional" interactions involving elevated tones, an issue related to her disability, without including that context. Additionally, her employment was terminated soon after having a discussion with her supervisor about her brain injury, write-ups, and a possible case with the EEOC. These instances, taken together, raise a fact issue as to whether her termination was due to her disability.[22]

---

[17] *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

[18] 773 F.3d 688 (5th Cir. 2014).

[19] *Id.* at 695.

[20] *Id.* at 695-97 (listing four reasons: (1) the rule of orderliness; (2) the fourth element was imported from a case focused on hiring, not termination; (3) alignment with other circuits; and (4) avoiding having to prove causation twice).

[21] *Id.* at 696.

[22] *Cf. LHC Grp.*, 773 F.3d at 701 (considering both "the chronology of the criticism" the plaintiff received and "comments her supervisors made").

No. 25-20195

Ramsey does not contest on appeal that SJC offered legitimate, non-discriminatory reasons for her termination. As detailed above, these reasons could include repeated tardiness and missed deadlines. The burden therefore shifts back to Ramsey to raise a fact issue regarding pretext. In other words, since SJC has offered legitimate reasons for its actions, Ramsey must raise a fact issue as to whether those reasons were the *true* reasons for her termination. We consider whether the jury could conclude instead that her termination was due to her disability.

"An employee seeking to show pretext must rebut each discrete reason proffered by the employer."[23] "At summary judgment, '[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of [the] defendant's true motive.'"[24] "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."[25] "Timing standing alone is not sufficient absent other evidence of pretext," but the "combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment."[26] "In the context of a summary judgment proceeding, the question is not whether the plaintiff

---

[23] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015).

[24] *LHC Grp.*, 773 F.3d at 702 (first alteration in original) (quoting *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir. 2003)).

[25] *Laxton*, 333 F.3d at 578.

[26] *Burton*, 798 F.3d at 240 (first quoting *Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 330 (5th Cir. 1998); and then quoting *Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001)).

proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext."[27]

In the Notice of Termination, Marvel cited to the three previous communications with Ramsey about performance issues: the Letter of Expectations, the Corrective Action Notice, and the Final Corrective Action Notice. The termination notice also cited another missed deadline and errors in an assignment. Ramsey contests the veracity of this explanation, arguing that the real reason for her termination was her disability.

It is worth noting that in the midst of Ramsey's write-ups, she still received an overall positive performance review. Ramsey's performance review for April 2020 to April 2021, signed one month after her June 3 Corrective Action Notice, on July 6, 2021, mentioned some issues with meeting deadlines but still agreed with her rating of herself as "valuable." Viewing the facts in the light most favorable to Ramsey, this could suggest that the shortcomings mentioned in the June 3 letter were not significant issues or at least that SJC was inconsistent in evaluating her performance deficiencies, which were the given reason for her termination.

Ramsey claims that the description about her unprofessional interactions in the Final Corrective Action Notice lacked the crucial context that she tried to explain to Marvel that the reason for her elevated tones was her hearing issues. Additionally, the notice seems to recognize that Ramsey was frustrated by her lack of accommodations but, as Ramsey claims, used this statement against her without providing the context about her disability. Given this alleged omission, a reasonable factfinder could doubt whether the

---

[27] *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 646 (5th Cir. 1985), *abrogated in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

other reasons listed, including tardiness and missed deadlines, were the real reason for the notice.

Ramsey also draws attention to what she claims are discrepancies in Dr. Hellyer's affidavit and Marvel's declaration that could demonstrate that they were untruthful about the reasons for her termination. Ramsey claims that their statements about not knowing of her disability at the time of her termination are false. Her argument with regard to Dr. Hellyer is without merit, but a reasonable factfinder could find issues with Marvel's declaration.

There is no evidence Dr. Hellyer knew about Ramsey's medical condition or treatment when she initially supported the decision to terminate Ramsey on December 1, 2021. The email Dr. Hellyer first received with the recommendation for termination repeated many of the reasons listed in Ramsey's write-ups and contained no reference to Ramsey's medical issues or requests for accommodations. The first time Ramsey points to Dr. Hellyer receiving notice of her condition was Ramsey's termination appeal email sent on December 10. When evaluating an employer's reasons for termination, "we 'take a snapshot at the moment of the allegedly discriminatory act.'"[28] Since Dr. Hellyer did not know about Ramsey's disability at the time of termination, it could not have been a reason for her decision. Ramsey points to Dr. Hellyer's affirmation of the termination decision after the appeal process and urges us to consider the date of that decision as the relevant one. Even if we were to consider that later date as the relevant one, mere knowledge about a disability does not suffice to show that the given reason for a termination was pretextual. Ramsey urges us to consider as misleading Dr. Hellyer's affidavit statements that she did not know about Ramsey's

---

[28] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 232 (5th Cir. 2015) (quoting *Patrick v. Ridge*, 394 F.3d 311, 319-20 (5th Cir.2004)).

disability at the time she made the decision to terminate her. We do not agree that these statements are misleading. In the record before us, there is no evidence Dr. Hellyer knew about Ramsey's disability when she supported the decision to terminate. There are no inconsistencies in Dr. Hellyer's affidavit that would cause us to question her proffered, legitimate reasons for Ramsey's termination.

However, Ramsey has successfully "cast doubt on [Marvel's] explanation" of the reasons for her termination, "thereby enabling a reasonable factfinder to conclude that it was false."[29] Marvel declared that he did not know if Ramsey "did, in fact, have a disability" or if she had "requested accommodations from the College for a disability" at the time he recommended her termination. He claimed that Ramsey "never told [him] she was disabled." Other evidence creates a genuine issue of material fact about Marvel's knowledge and the statements in his declaration. Ramsey took several weeks of FMLA leave while Marvel was her supervisor. When she returned, she contacted him about her migraines, her planned physician's appointments under her intermittent FMLA leave, and her requested accommodation of a headset. Additionally, Ramsey claimed she told Marvel about her hearing issues when he had a conversation with her about using elevated tones, which was mentioned in the Final Corrective Action Notice. In that notice, Marvel also attributed a quote to Ramsey in which she complained about other people not accommodating her; this could suggest his knowledge of her previously seeking accommodations. Marvel's handwritten notes from a meeting with Ramsey demonstrate his knowledge of her brain injury and her belief that she had a case against SJC with the EEOC, which could suggest that he knew she was disabled and that she told

---

[29] *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir.2002).

him she was disabled. While this knowledge is not by itself enough to prove pretext, Ramsey raises a fact issue as to whether Marvel misrepresented his knowledge, and she has also pointed to Marvel leaving crucial context about her disability out of his Final Corrective Action Notice. Since Marvel's statement about his knowledge of Ramsey's disability is contradicted by other facts in the record, a reasonable factfinder could conclude that Marvel's statements about why Ramsey was fired are not credible.

The dissenting opinion states that the above analysis is "predicated on the notion that Ramsey's supervisor lied under penalty of perjury," which it characterizes as "quite an accusation."[30] The element of pretext itself necessarily involves accusations of lying since the inquiry is into whether the employer's proffered explanation for its action is worthy of credence. At the summary judgment stage, we consider only whether there is a fact issue as to the veracity of Marvel's explanation so that a reasonable jury *could* find that his proffered reasons for her termination were false. The dissenting opinion also states that Marvel "acknowledged [Ramsey's] health issues" in his declaration and questions why he "would detail his knowledge of her health issues but then perjure himself as to whether he knew Ramsey had a legal disability."[31] Marvel's declaration at most indicated that he knew Ramsey went on FMLA leave from July to September 2021 and that Ramsey "had made a comment about having hearing issues." But Ramsey presented evidence that she also told Marvel about other issues such as her migraines and her brain injury.

SJC emphasizes that Dr. Hellyer was the final decisionmaker, so even if Marvel discriminated against Ramsey, that would be irrelevant. Ramsey

---

[30] *Post* at 28.

[31] *Post* at 28.

responds with the "cat's paw" theory.  Under a cat's paw theory, an employer is liable "even if the ultimate decisionmaker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus."[32]  Here, Marvel was Ramsey's direct supervisor; he had knowledge of her performance and her disability.  He recommended her termination, and the email sent to Dr. Hellyer included descriptions from the Final Corrective Action Notice and from the later-sent Notice of Termination, documents which Marvel wrote.  It seems clear that Marvel's recommendation for termination was the primary basis for Dr. Hellyer's decision to terminate.[33] Additionally, the investigation undertaken after Ramsey's appeal of her termination does not automatically relieve SJC of liability.[34]  A reasonable factfinder could conclude that, even with the investigation, Marvel's recommendation caused Ramsey's termination.

Since Ramsey has raised a fact issue as to pretext, we reverse the district court's grant of summary judgment on Ramsey's ADA discrimination claim.

---

[32] *Jones v. City of Hutto*, 154 F.4th 332, 338 (5th Cir. 2025) (quoting *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017)).

[33] We do not address whether Ramsey must prove that Marvel's actions were a but-for cause of her termination or a proximate cause because, regardless, she meets the higher standard of but-for causation.  *See Harmon v. Collier*, 158 F.4th 595, 617 (5th Cir. 2025) (describing how when a "claim only requires discriminatory animus to be a motivating factor, cat's paw liability requires a showing that the co-worker's discriminatory animus was a proximate cause of the adverse employment decision" whereas "when the claim requires but-for causation . . . cat's paw liability instead requires a showing that the co-worker's animus was a but-for cause of the adverse employment action").

[34] *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (noting that an independent investigation does not "relieve[] the employer of 'fault'" unless it "results in an adverse action for reasons unrelated to the supervisor's original biased action" and determines that the "adverse action was, apart from the supervisor's recommendation, entirely justified").

No. 25-20195

## B

The district court dismissed Ramsey's ADA retaliation claim for failure to brief the argument.  It specifically stated that Ramsey did not respond to SJC's argument that Ramsey did not engage in a protected activity, the first required element of her prima facie case.  While Ramsey's response to SJC's motion for summary judgment did not outline the legal standard for her retaliation claim or address the retaliation claim separately from her other ADA claims, she did directly respond to SJC's argument that she did not engage in a protected activity.  She noted that she sought lighting accommodations due to her migraines and headset accommodations due to her hearing issues.  She also addressed SJC's argument that she could not prove pretext for retaliation in the same section that she addressed pretext for her discrimination claim, writing several times that the true reason for her termination was both her disability and her request for accommodations.  We will consider the claim on the merits.[35]

For an ADA retaliation claim, a plaintiff must first establish a prima facie case.

> If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision.  After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred but for the employer's retaliatory motive.  In order to avoid summary judgment, the plaintiff must show a conflict in substantial evidence on the question of whether the

---

[35] *Cf. January v. City of Huntsville*, 74 F.4th 646, 652 n.4 (5th Cir. 2023) (considering a claim that was briefed together with other claims for convenience).

employer would not have taken the action but for the protected activity.[36]

For her prima facie case, Ramsey must demonstrate that: "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action."[37]

> On prong one, making a request for a reasonable accommodation under the ADA constitutes participat[ing] in an activity protected under the statute. . . . On prong two, dismissal constitutes an adverse action. And on prong three, a plaintiff alleging retaliation may satisfy the causal connection element by showing close timing between an employee's protected activity and an adverse action against him. Satisfying the third prong with temporal proximity alone requires the timing to be very close. We have ruled, for example, that a six-and-a-half-week timeframe is sufficiently close . . . to establish the causal connection element of a prima facie case of retaliation.[38]

Ramsey raises a fact issue as to her engaging in a protected activity because she claimed she requested both lighting accommodations and headset accommodations from SJC to cope with her migraines and other symptoms

---

[36] *Feist v. La., Dep't of Just., Off. of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (internal quotation marks and citations omitted) (first quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007); and then quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

[37] *Id.*

[38] *Way v. City of Missouri City*, 133 F.4th 509, 522 (5th Cir. 2025) (internal quotation marks omitted) (first quoting *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304-05 (5th Cir. 2020); and then quoting *Feist*, 730 F.3d at 454).

of her medical condition.[39]    For the second element, her termination constitutes an adverse action.  For the third element, there is no specific timeframe for her requests for lighting accommodations or the initial headset request in the record other than that they occurred in approximately 2020 or 2021, but the record does show that her later request for a headset accommodation occurred twelve days before her supervisor recommended her termination.  That timeframe is sufficiently close to establish the causal element for her prima facie case of retaliation.

Ramsey does not contest that SJC raised legitimate, non-discriminatory reasons for her termination.  Accordingly, as with her ADA discrimination claim, the burden once again shifts to Ramsey to raise a fact issue regarding pretext.

"While 'temporal proximity standing alone is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason,'" the "combination of suspicious timing with other significant evidence of pretext[ ] can be sufficient to survive summary judgment."[40]

As discussed above, the Final Corrective Action Notice attributes a quote to Ramsey that seems to indicate her frustration at the lack of accommodations given by SJC.  This quote was used as an example of an unprofessional interaction worth mentioning in her write-up without, as Ramsey claims, the context about her hearing issues.  This quote also provides circumstantial evidence that Marvel knew about her previous

---

[39] *See Way*, 133 F.4th at 514, 522 (finding a fact issue as to a protected activity when the plaintiff asked her direct supervisor for specific accommodations for her anxiety).

[40] *January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023) (alteration in original) (first quoting *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008); and then quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015)).

requests for accommodations.   Marvel's notes from his November 21 meeting with Ramsey also circumstantially support that he knew about Ramsey's previous requests for accommodations, as her comments about not receiving empathy and having a potential case with the EEOC could be related to those requests.  Given the claimed omission about the context of her hearing issues in this notice, a reasonable factfinder could doubt whether the other reasons listed were the real reason for the notice.

Additionally, as previously discussed, Ramsey has successfully "cast doubt on [Marvel's] explanation" of the reasons for her termination, "thereby enabling a reasonable factfinder to conclude that it was false."[41] Marvel declared that he did not know if Ramsey had "requested accommodations from the College for a disability" at the time he recommended her termination.  However, considering the information in the Final Corrective Action Notice and the meeting notes, there is a genuine issue of material fact about Marvel's knowledge and the statements in his declaration.  While this knowledge is not by itself enough to prove pretext, Ramsey has claimed that he has misrepresented his knowledge, making his explanation unworthy of credence, and Ramsey has also pointed to Marvel's leaving out crucial context about her hearing issues in her write-up.  A reasonable factfinder could find that Marvel's statement about his knowledge of Ramsey's request for accommodations was false and that the other statements about why Ramsey was fired were not the real reasons for her termination.

As discussed above, there is no evidence in the record showing that Dr. Hellyer knew about Ramsey's requests for accommodations at the time she made her decision to support Ramsey's termination.  However, under

---

[41] *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002).

the cat's paw theory, Ramsey sufficiently raises a fact issue about Marvel's retaliatory animus and his recommendation's role in her termination. We thus reverse the district court's grant of summary judgment on Ramsey's ADA retaliation claim.

## C

Ramsey argues the district court erred in dismissing her FMLA retaliation claim. The district court dismissed this claim because it held that Ramsey failed to raise a genuine issue of material fact on pretext. The district court stated that Ramsey did not identify specific evidence in the record to support her claim. While it is true that Ramsey did not expound on her pretext arguments, other than the one about timing, in the FMLA retaliation section of her response to SJC's motion for summary judgment, she did cite to specific evidence and explain how SJC's reasons for terminating her were pretextual in the ADA claims section right before the FMLA retaliation section. For example, she pointed to Marvel's notes from his meeting with Ramsey that demonstrated a knowledge of her disability and requests for accommodations as evidence that Marvel's statements about his knowledge of such were false, making his explanation about the legitimate reasons for her termination questionable. She also mentioned her 2020-21 performance review, which rated her as valuable, as contradicting SJC's explanation of performance deficiencies as the reason for her termination. Given that both the ADA claims and FMLA claims are subject to the *McDonnell Douglas* framework[42] and evidence of pretext can apply to both claims, Ramsey sufficiently cited to evidence of pretext in the district court that could apply to her FMLA retaliation claim.

---

[42] *Way*, 133 F.4th at 524.

No. 25-20195

To establish a prima facie case for retaliatory discharge, Ramsey must show that "(1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge."[43]   On appeal, SJC does not challenge that Ramsey established her prima facie case, and Ramsey does not challenge that SJC articulated a legitimate, nondiscriminatory reason for her termination.   It is Ramsey's burden to raise a fact issue that SJC's reason was pretextual.

Ramsey emphasizes the close timing of her write-ups in relation to her FMLA activity, which is relevant both to the causation element of her prima facie claim[44] and as evidence of pretext.[45]   The Final Corrective Action Notice came less than a month after her intermittent leave was revised and about a month-and-a-half after her intermittent leave was approved.   Her termination notice came one month later.   While timing alone is not enough to raise a fact issue regarding pretext,[46] "the pretext arguments [Ramsey] raised with respect to the ADA apply equally to the FMLA."[47]   Ramsey has raised a fact issue with regard to pretext.   As discussed above, Ramsey uses the cat's paw theory to connect Marvel's retaliatory animus and

---

[43] *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005); *see also Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (noting a prima facie case of retaliation requires: "(1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal link exists between her protected activity and the adverse action").

[44] *See Way*, 133 F.4th at 526 (finding a causal link between the plaintiff's termination and her FMLA leave, "given the proximity between her request for leave and her termination").

[45] *Id.* (discussing the timing of the termination and request for FMLA leave as one sign of possible pretext).

[46] *See January*, 74 F.4th at 656 ("[T]emporal proximity isn't enough.").

[47] *Caldwell v. KHOU-TV*, 850 F.3d 237, 246 (5th Cir. 2017).

recommendation for her termination to Dr. Hellyer's termination decision.[48] Ramsey has raised a fact issue with regard to pretext, and the district court erred in dismissing her FMLA retaliation claim.

## D

Ramsey argues the district court erred in dismissing her FMLA interference claim. "To establish a prima facie case of interference under the FMLA, a plaintiff must show that (1) [s]he was an eligible employee; (2) [her] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of [her] intention to take FMLA leave; and (5) [her] employer denied [her] the benefits to which [s]he was entitled under the FMLA."[49] The district court concluded there was no evidence that SJC interfered with Ramsey's FMLA rights. Ramsey's only argument as to interference is that the termination itself, which occurred while she was in an approved period of intermittent leave, constituted interference because it prevented her from continuing to use that intermittent leave. Ramsey cites to no authority for this proposition. Ramsey's response to the motion for summary judgment before the district court provided even less explanation of this argument. Given the inadequate briefing, Ramsey has forfeited this claim.[50] We affirm the district court's grant of summary judgment on this claim.

---

[48] *Cf. Way*, 133 F.4th at 525 (applying the cat's paw theory to an FMLA retaliation claim).

[49] *Id.* at 245 (alterations in original).

[50] *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal.").

No. 25-20195

\*    \*    \*

We REVERSE the district court's grant of summary judgment on the ADA claims and the FMLA retaliatory discharge claim, AFFIRM the grant of summary judgment on the FMLA interference claim, and REMAND for further proceedings.

No. 25-20195

Andrew S. Oldham, *Circuit Judge*, dissenting:

Plaintiff Jennifer Ramsey sued her employer San Jacinto College District ("SJC") for employment discrimination. The district court granted summary judgment to SJC. Because any reasonable employer would have fired Ramsey for her deficient job performance, I would affirm.

I

Jennifer Ramsey had a checkered employment history at SJC. First, the good. She started working for SJC in 2005. Over the next decade and a half, she was promoted four times. Between 2018 and 2021, Ramsey began to suffer from "a severe medical condition" that afflicted her "vision, hearing, balance, and other cognitive functions." ROA.729. As a result, Ramsey took leave under the Family and Medical Leave Act ("FMLA") from November 2020 through January 2021. On January 4, 2021, Ramsey provided SJC with a letter from her physician that cleared her to return to work with no restrictions. So far so good.

After Ramsey returned to work, however, things went sideways. She repeatedly arrived late, submitted work product riddled with errors, and failed to improve her performance despite multiple warnings. *See* ROA.1095–99. Accordingly, SJC fired her.

II

Ramsey claims that her termination violated the Americans with Disabilities Act ("ADA") and FMLA. The majority finds a genuine dispute of material fact as to whether SJC's stated reasons for firing Ramsey were pretext, and the majority posits that Ramsey was fired because of her disability. I respectfully disagree. I (A) explain why Ramsey's deficient performance obviously motivated her firing and (B) respond to the majority.

No. 25-20195

A

Here is a timeline of Ramsey's deficient conduct:

- Months preceding January 2021: Ramsey "many times" arrived late without giving notice to her supervisor and continued to do so despite receiving feedback. ROA.893.
- January 13, 2021: Ramsey was late to work. ROA.893.
- January 15, 2021: Ramsey was late to work. ROA.893.
- April 27, 2021: Ramsey did not reply to her supervisor's message for over six hours. ROA.617.
- May 2021: Ramsey did not submit her leave report on time. She also failed to submit timely reports in April 2020, August 2020, and October 2020. ROA.612.
- May 12, 2021: Ramsey did not show up to work and failed to tell her supervisor until asked. ROA.612.
- June 3, 2021: Ramsey was late to work and missed a meeting. ROA.612.
- June 28, 2021: Ramsey did not come into the office as scheduled. She also changed a one-hour "personal appointment" to three hours without notice and did not reply to her supervisor's text for hours. ROA.617.
- June 29, 2021: Ramsey was late to work. ROA.617.[1]
- September 24, 2021: Ramsey failed to complete an assignment by the deadline. ROA.620.
- September 27, 2021: Ramsey was late to work. ROA.620.
- September 29, 2021: Ramsey was late to work. ROA.620.
- September 30, 2021: Ramsey was late to work. ROA.620.

_____

[1] Note that Ramsey took FMLA leave between July 27 and September 7.

- October 4, 2021: Ramsey was late to work. ROA.620.
- October 7, 2021: Ramsey still had not completed the assignment due on September 24 and had blown past her updated deadline of October 1. ROA.620.
- October 11, 2021: Ramsey failed to follow a supervisor's instruction to stop working on the project she repeatedly failed to complete in a timely manner. ROA.620.
- October 14, 2021: Ramsey was late to work. ROA.620.
- October 19, 2021: Ramsey was late to work. ROA.620.
- October 20, 2021: Ramsey was late to work. ROA.620.
- November 1, 2021: Ramsey failed to timely complete another assignment. ROA.620.
- November 2, 2021: Ramsey failed to timely complete the November 1 assignment. ROA.620.
- November 2, 2021: Ramsey submitted an assignment with "several errors." ROA.621.
- November 3, 2021: Ramsey was late to work. ROA.620.
- November 5, 2021: Ramsey re-submitted the November 2 assignment, again with errors. ROA.621.
- November 8, 2021: Ramsey was late to work. ROA.620.
- November 11, 2021: Ramsey was late to work. ROA.620.
- December 1, 2021: Ramsey submitted an assignment that she promised on October 18. She had previously failed to provide it after four requests, and when she finally did provide it, it "contained multiple errors and was unacceptable." ROA.621.

Given this woeful record, I cannot imagine how any reasonable juror could conclude that SJC's stated reasons for firing Ramsey were pretextual. Many of Ramsey's excuses for her poor performance had nothing to do with her

medical problems: traffic, "mismanaged . . . time", a late dishwasher delivery, a "slow tire leak," a visit from her daughter, and "rodent carnage" at her house. *See* ROA.604; ROA.620; ROA.637–48. And when Ramsey did need to miss time for doctor's appointments, her supervisor "approved every request she made." ROA.620. There is no genuine dispute of material fact as to why SJC fired Ramsey.

B

With deep respect to my learned colleagues who see the case differently, the majority's reasoning is unpersuasive.

First, the majority posits that Ramsey received a positive performance review for the period from April 2020 to April 2021, so her unprofessional conduct may not have been the reason SJC fired her. *See ante*, at 11. But most incidents cited in Ramsey's termination letter occurred during the fall of 2021. *See* ROA.587 (citing, *inter alia*, a multitude of missed deadlines and faulty work product). That Ramsey received a positive review before much of her deficient performance does not undermine SJC's stated reasons for her termination.

Next, the majority credits Ramsey's argument that certain incidents mentioned in SJC's Final Corrective Action Notice lacked "crucial context" about her medical problems. *Ante*, at 11. To my esteemed colleagues, the lack of context behind some documented shortcomings means that "a reasonable factfinder could doubt whether the other reasons listed, including tardiness and missed deadlines, were the real reason for the notice." *Id.* at 11–12.

With all due respect, that is pure speculation. The document provides a laundry list of shortcomings in Ramsey's performance. *See* ROA.653–54. That a few of the many stated reasons did not give full "context" does not undermine the multiple, legitimate reasons for her firing. True, we must give

Ramsey as the non-movant the benefit of all reasonable inferences from the summary judgment record. But faulting SJC for failing to provide full "context" for some of its myriad justifications is like faulting SJC for including a typo in its termination letter: Neither provides any basis for denying summary judgment.

Finally, the majority relies on the fact that Ramsey's supervisor stated in his affidavit that he did not know Ramsey had a disability, while reading other facts in the record to contradict the supervisor's assertion. *See ante*, at 13–16. This entire point is predicated on the notion that Ramsey's supervisor lied under penalty of perjury. That's quite an accusation. It is also implausible, because Ramsey's supervisor acknowledged her health issues in the affidavit. He just "did not know if Ms. Ramsey did, in fact, have a disability." ROA.622. The majority cannot explain why Ramsey's supervisor would detail his knowledge of her health issues but then perjure himself as to whether he knew Ramsey had a legal disability. And, most importantly, there is no evidence that his knowledge of Ramsey's medical issues played any role whatsoever in his decision-making. He swore otherwise: "I did not consider any time Ms. Ramsey was away from work due to doctor's appointments, or personal health issues . . . when making my recommendation to terminate her employment." *Ibid.*[2] We cannot simply presume that's a lie based on no evidence. *But see ante*, at 13–16 (so presuming).

For these reasons, I respectfully dissent.

---

[2] The majority relies on the above evidence to reverse on Ramsey's ADA discrimination claim. The majority's treatment of Ramsey's ADA and FMLA retaliation claims substantially tracks the ADA discrimination analysis, so my responses apply to Ramsey's other claims, too. *See ante*, at 18–20, 21–22.